**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-138-002 (RBW)** |
| **JONATHAN GRACE,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jonathan Grace to 27 months of incarceration, which is the middle of the guideline range—24 to 30 months—calculated by the Probation Office and agreed to by the parties, 3 years of supervised release, $2,000 restitution, and a mandatory $100 special assessment.

## I.  INTRODUCTION

The defendant, Jonathan Grace, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Jonathan Grace was a knowing, relentless participant in the Capitol riot on January 6, 2021. After illegally entering Capitol grounds amidst toppled bike rack barriers, tear gas in the air, and emergency dispersal warnings blaring, Grace maneuvered through thousands of rioters, made his way to the Lower West Terrace, and entered the tunnel. Some of the most violent conduct on January 6 occurred in the tunnel as officers barricaded their bodies in a tight corridor to prevent rioters from flooding into the heart of the Capitol building, while rioters continuously attacked those officers in an effort to gain entry. Grace joined that attack not once, not twice, but three times. He was undeterred. During one of his stints in the tunnel, Grace joined the mob and used the full force of his body weight to collectively push against the officers as rioters coordinated the pushes by yelling, "Heave! Ho!" During this time, one officer became trapped between a door frame and a stolen riot shield held by a rioter. With the collective weight of the mob bashing into the pinned officer, the officer screamed out for help as he was violently attacked by another rioter. During Grace's second entrance into the tunnel, he made his way near the police line, forcefully pushed into the line, and yelled to encourage other rioters. Even after officers finally cleared the tunnel, Grace remained at the mouth of the tunnel and continued to fight the officer line for another thirty minutes, eventually pushing his way back into the tunnel for a third time.

For that violent and violence abetting conduct, the government recommends that the Court sentence Grace to 27 months of incarceration, which is the mid-point within the advisory Guidelines' range of 24 to 30 months, for Grace's conviction for assaulting a federal law enforcement officer in violation of 18 U.S.C. § 111(a)(1). A 27-month sentence reflects the gravity

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

of Grace's criminal conduct and takes into account his admission of guilt.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 79 ¶¶ 1-7, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.    Grace's Role in the January 6, 2021 Attack on the Capitol

On January 5, 2021, Grace traveled from his residence in Colorado Springs, Colorado to Washington, D.C. to attend the former president's "Stop the Steal" rally. After attending the rally, Grace marched to the U.S. Capitol. He entered the restricted Capitol grounds on the West Front, which was a scene of chaos. Tear gas and other chemical irritants filled the air, emergency warning systems blared into the crowd, and the line of police officers spread across the West front were under constant attack from the mob.

Eventually, rioters overran the police lines on the West Front and officers retreated up to the Lower West Terrace. Officers escaped into the nearest entrance to the Capitol building – the tunnel, which was a narrow hallway created by the construction of the inauguration stage. Rioters followed officers into the tunnel and, for the next several hours, engaged in hand-to-hand combat in a fight over access to the building. To defend the Capitol, the officers used their bodies to barricade the tunnel as rioters continuously attacked them using a variety of weapons.

After making it through the crowds on the West Front, Grace ascended to the Lower West Terrace and made his way to the tunnel. By the time Grace arrived, rioters had been fighting with

officers for about thirty minutes. The rioters strategically circulated in and out of the tunnel to keep "fresh bodies" in the fight.

Grace chose to join the fray. At 3:11:47 p.m., he entered the tunnel, and remained there, fighting the officers, for nearly an hour. Some of the worst violence against police officers occurred during this period and at this location.

When Grace entered the tunnel, one of the methods adopted by the rioters was coordinated pushing against the officers. Rhythmically yelling "Heave! Ho!" as their signal, and locking arms or bodies with each other, the rioters would move backwards in unison before rocking and pushing forward together. *See* Exhibit 4 at :45-1:05. That meant the officers in the tunnel had to sustain the weight of all the rioters moving forward against them at once. As Grace and other rioters launched these coordinate assaults, officers continuously yelled, "MOVE BACK!"

 



*Images 1-3: Screenshots of Exhibit 1 showing Grace (yellow circle) entering the tunnel and joining the collective pushes against the police line*

As the mob continued to assault the officer line, Metropolitan Police Department Officer Daniel Hodges became stuck between a metal door frame and a riot shield held by a rioter. In what was one of the most visceral and prolonged attacks against a police officer on January 6, the officer's chest became compressed, and his body trapped as the collective weight of the mob – Grace included – collectively slammed into the officer line. As that officer was crushed by the mob, another rioter (Steven Cappuccio[2]) took advantage of the officer's vulnerability and forcefully ripped off the officer's gas mask and struck the officer directly in the face with a stolen police baton.

---

[2] Cappuccio was found guilty of Assault with a Deadly or Dangerous Weapon for this attack following a trial before Judge McFadden. *See* 21-cr-40 (TNM). Cappuccio was sentenced to 85 months of incarceration.



*Image 4: Screenshot of Exhibit 3 (at 21:08) showing an officer pinned between a door frame and a riot shield held by a rioter as the mob thrust their body weight into the officer line, crushing him*

The fighting subsided for a few moments. Grace exited the tunnel but remained nearby. Just outside the tunnel, Grace pulled an item out of his pocket, removed his tie string backpack, and took off his beanie, and handed these items to his wife, Vanessa Grace, who stood immediately outside the tunnel.

 

*Images 5-6: Screenshots of video footage (Exhibit 1, right) showing Grace outside the tunnel removing some of his clothing and handing it to his wife, before re-entering the tunnel*

At about 3:15 p.m., less than one minute after he exited from the tunnel, Grace saw another opening, and he re-entered.



*Image 7: Screenshot of video footage showing Grace (yellow circle) re-entering the tunnel a second time*

During his second entry, Grace forcefully pushed his way near the front line of rioters as the rioters called out "Heave! Ho!" and violently thrust their collective weight into the police line. The rioters – Grace included – pushed so hard that the group collectively swayed back and forward several feet. *See* Exhibit 1. Officers at the front of the police line continued to order the crowd, including Grace, to "BACK UP!," but Grace continued to ignore their commands. *See* Exhibit 9. Instead, rioters yelled things like "PUSH!" and "LET'S GO!" *See* Exhibit 5. Grace lowered his head and forcefully pushed into the officers. He then turned and yelled to rioters behind him.



*Images 8-9: Screenshot of Exhibit 5, left, and Capitol surveillance footage (Exhibit 2), right, showing Grace (yellow circle) forcefully pushing into the police line and yelling to summon other rioters into the tunnel*

As the battle continued, officers deployed chemical irritants, which allowed officers to gain momentum and push Grace and other rioters out of the tunnel. As Grace was being pushed out, he turned his back to the officer line and grasped onto the wall. Even as rioters around him retreated, Grace did everything he could to maintain his ground inside the tunnel.



*Images 10-11: Screenshot of Capitol surveillance footage showing Grace (yellow circle) fighting to remain in the tunnel as officers pushed him and other rioters out*

At approximately 3:18 p.m., as police officers successfully pushed the rioters out of the

tunnel, a nearby rioter secured his arm around the neck of MPD Officer Michael Fanone and pulled

the officer away from the police line and into the crowd.



*Image 12: Screenshot of Capitol Surveillance footage showing Grace (yellow circle) at the mouth of the tunnel as another rioter pulls a MPD officer into the crowd (red oval)*

Rioters swarmed Officer Fanone and violently assaulted him as Grace watched nearby.



*Image 13: Photograph showing Officer Fanone (red square) in the crowd as rioters violently assaulted him while Grace (yellow circle) watched nearby*

After watching the attack on Officer Fanone, around 3:41 p.m., Grace reapproached the

tunnel – for the third time. Exhibit 2.



*Images 14-15: Screenshot of Capitol Surveillance footage, Exhibit 2 (left), and open source footage (right) showing Grace (yellow circle) re-approaching the tunnel for the third time*

Grace positioned himself at the front of the rioters. He remained here, forcibly pushing into the police line, for the next *thirty minutes. See* Exhibit 2.



*Image 16: Screenshot of Capitol Surveillance footage showing Grace (yellow circle) forcefully pushing into the officers*

As Grace pushed into the officers, a rioter next to him with a bullhorn directed the officers to "STAND DOWN!" and yelled that the rioters were there "fighting for America!" *See* Exhibit 7.

After unsuccessfully trying to enter the tunnel for several minutes, Grace changed his strategy by turning his body to the side, lowering his shoulder, and pushing directly into the police line.



*Image 17: Screenshot of body worn camera footage (Exhibit 7) showing Grace (yellow circle) forcefully pushing into the officers*

After several minutes of pushing with his shoulder, Grace next turned his back to the officers and pushed into the officer line that way.



*Image 18: Screenshot of body worn camera footage (Exhibit 7) showing Grace (yellow circle) making physical contact as he pushed directly into a police officer*

Grace gradually gained ground as rioters around him continued to assault the officers using

a variety of objects and weapons.

By 3:50 p.m., after nine minutes of pushing into the officers, Grace had made it back into the tunnel. He was at the head of the rioters, pushing directly into the police officers.



*Image 19: Screenshot of Capitol surveillance footage (Exhibit 2) showing Grace (yellow circle) pushing into the officer line in the mouth of the tunnel*

At that point, other rioters continued to viciously assault the officers. Rioters assumed a tactical position by climbing overtop the crowd of rioters and, while there, spraying chemical irritants, swinging poles, and utilizing other weapons against the officers.



*Image 20: Screenshot of Capitol surveillance footage (Exhibit 2) showing rioters violently attacking the police line*

Some rioters grabbed onto the top of the archway and kicked police officers. For his part,

Grace continued push into the officer line, as well as support the rioters crawling over top of him.



*Image 21: Screenshot of Capitol surveillance footage (Exhibit 2) showing rioters violently attacking the police line*

By 4:00 p.m., after persistently pushing into the officer line, Grace had made it several feet into the tunnel – farther than any other rioter around him. His forceful and persistent pushing allowed Grace to inch into the building, which in turn made room for other rioters.





*Images 22-23: Screenshot of Capitol surveillance footage (Exhibit 2, top) and body worn camera footage (Exhibit 8, bottom) showing Grace (yellow circle) pushing into the officer line in the tunnel*

As Grace forcefully pinned the officers by backing into them, other rioters took advantage of the officers' precarious positions. For example, as Grace pinned one officer, another rioter reached over top and sprayed the officer in the face with chemical irritant.



14



*Images 24-25: Screenshot of body worn camera footage (Exhibit 8) showing chemical irritants being sprayed at police officers as Grace (yellow circle) continued to push into the police line*

Officers loudly directed rioters to "BACK UP!" but Grace refused. A rioter nearby Grace responded by yelling, "JOIN US!"

By 4:06 p.m., rioters again climbed on the shoulders of the mob and continued to attack the officers. By this point, Grace had gained more ground. Grace had made it deeper into the tunnel than any other rioter at the time, and he continued to push.



*Image 26: Screenshot of Capitol surveillance footage (Exhibit 2) showing rioters violently attacking the police line*

15

As rioters continued to pass forward objects to use as weapons, including riot shields, and a ladder made its way into the tunnel, they chanted, "USA! USA! USA!" They continued to ignore officer commands to leave the tunnel. Grace remained at the forefront of the rioters in the tunnel.



*Images 27-28: Screenshots of body worn camera footage (Exhibit 6) showing Grace (yellow circle) trying to maintain his ground in the tunnel*

Finally, after thirty minutes of battling the rioters, police officers again deployed chemical irritant at the rioters to disperse the crowd. Only then did Grace retreat from the tunnel alongside another, blood-splattered rioter (Kyle Fitzsimmons) who had also been violently assaulting police officers.



*Image 29: Screenshot of open source footage showing Grace, left, shortly after he was forced out of the tunnel*

16

### III.    THE CHARGES AND PLEA AGREEMENT

Grace was arrested on March 30, 2023 after a criminal complaint was filed charging him with seven criminal violations related to the Capitol riot. ECF No. 22; Minute Order (3/30/2023). On April 26, 2023, a federal grand jury returned an indictment charging Grace with seven counts, including assaulting, resisting, or impeding certain officers in violation of 18 U.S.C. § 111(a)(1). On October 18, 2023, Grace was convicted of that offense based on a guilty plea entered pursuant to a plea agreement.

### IV.    STATUTORY PENALTIES

Grace now faces sentencing on 18 U.S.C. § 111(a)(1). As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, Grace faces up to 8 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

### V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The Probation Office calculated the combined offense level of the count of conviction as 17, as set forth below.

Count One: 18 U.S.C. § 111(a)(1)

U.S.S.G. § 2A2.2(a)[3]          Base Offense Level                          14

---

[3] U.S.S.G. § 2A2.2(a) applies because, as the plea agreement sets forth, the assault was an "aggravated assault" based on McNamara's intent to commit another felony, 18 U.S.C. § 231(a)(3) (civil disorder).

| U.S.S.G. § 3A1.2 | Official Victim | +6 |
| --- | --- | --- |
| **Total Offense Level:** | | **20** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | <u>-3</u> |
| **Adjusted Offense Level:** | | **17** |

*See* PSR ¶¶ 51-60; Plea Agreement at ¶ 5(A).

The U.S. Probation Office calculated Grace's criminal history as category I, PSR ¶ 64, which the government does not dispute. Accordingly, based on the government's calculation of Grace's total adjusted offense level of 17 after acceptance of responsibility, Grace's Guidelines imprisonment range is 24 to 30 months. PSR ¶ 10.

Grace's plea agreement contains an agreed-upon Guidelines range calculation that mirrors Probation's calculations. ECF No. 78 at 3.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 was not considered at the time the parties entered into the plea agreement. It does not impact Grace's guidelines calculations.

Section 4C1.1 does not apply in this case because Grace used violence against officers, including when he used his body weight to push against the line of officers protecting the Capitol building in the tunnel. *See* U.S.S.G. § 4C1.1(a)(3) (providing that the adjustment for zero-point offenders only applies if "the defendant did not use violence or credible threats of violence in connection with the offense"). As explained in this memorandum, Grace joined the mob and collectively pushed into the police line on two occasions and then, after the officers had gained

ground and pushed rioters out of the tunnel, Grace returned to the tunnel and continued to forcefully push against the police line for thirty minutes, making physical conduct and using violence against the officers. *See* 4C1.1(a)(3) (The Section 4C1.1 adjustment is applicable if the defendant meets the following criteria: "the defendant did not use violence or credible threats of violence in connection with the offense").

The government is aware of several cases in which courts have rejected the application of § 4C1.1 to January 6 defendants who engaged in violence, *e.g.*, *United States v. Gundersen*, 21-cr-137 (RC); *United States v. Baquero*, 21-cr-702 (JEB); *United States v. Fonticoba*, 21-cr-638 (TJK); *United States v. Giberson*, 23-cr-115 (CJN); *United States v. Dillard*, 23-cr-49 (JMC).

VI.    **SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)**

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

A.    **Nature and Circumstances of the Offense**

As shown in Section II(B) of this memorandum, Grace's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Grace was a protracted and active participant in that riot. He made his way to the epicenter of violence – the tunnel – where he entered several times, making his way to the front of the crowd each time and actively assaulting the police line with his own body and by taking advantage of the collective weight of those around him. After being pushed out of the tunnel the first time, Grace was not deterred; he re-entered a mere one minute later and immediately resumed his assault on the police. And then after being pushed out again and watching

a violent assault against an officer, Grace pushed his way back to the tunnel for the third time, where he engaged in a continuous, forceful, and targeted assault for thirty minutes. Each time he thrust himself into the wall of rioters pushing against the police, he aided and abetted the actions of his fellow rioters inside the tunnel who violently attacked the officer.

This factor cuts heavily in favor of a 27-month term of incarceration.

### B.    Grace's History and Characteristics

Grace is a 49-year-old physical therapist from Colorado with no criminal history. He has steady employment and a family. Grace acknowledged to Probation that he was remorseful for his conduct and there was "no excuse" for his actions. PSR ¶ 49. This supports the government's recommendation, which falls at the mid-point of the guideline range, rather than a high-end sentence.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Grace's criminal conduct on January 6 was the epitome of disrespect for the law and our constitutional process. When Grace thrice entered the Lower West Tunnel, he made an active decision to physically engage with police in what some of those officers have characterized as a "medieval battle." *See, e.g.*, Peter Herman, *'We got to hold this door'*, WASHINGTON POST, January 14, 2021, *available at* https://www.washingtonpost.com/dc-md-va/2021/01/14/dc-police-capitolriot/?arc404=true.

Grace was not a passive participant in this conduct: he was at the head of the line for his first foray into the tunnel and readily engaged with the mob's synchronized pushing against officers; he rejoined for the same type of conduct for his second foray; and he was again at the

front, leading rioters for a significant period of time in the assault.   It was not, however, just his conduct against police officers that showed his disrespect for the law, it was also the reason that he undertook those violent acts: to stop the peaceful transition of power. Grace, as a member of that mob, was not merely disrespecting the law, he was an active participant in an attack on the bedrock principle of our republic. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that this violent conduct and the motives that underlie it are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (explaining it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.      The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence against Grace also weighs in favor of a lengthy term of incarceration. First, for an entire hour, he ignored police pleas to "GET BACK!" and dodged chemical irritants that successfully moved other rioters back. Grace initially

---

[4]  *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

entered the tunnel amidst violence. Grace was determined to use physical force and was aiding and abetting near-deadly violence against the police; thus, the government's recommended sentence is sufficient but not unnecessary to specifically deter Grace should he become dissatisfied with the outcomes of future elections.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly

considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("[A]s far as disparity goes, . . . I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how

other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[6]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Galetto*, 21-cr-517 (CKK), the defendant approached the Lower West Tunnel around 2:40 p.m., as one of the first rioters in the area. Like Grace, Galetto joined the mob's collective heave ho pushing against the officer line while at the front of the pack of rioters. He used his body weight as a weapon and he took advantage of the collective weight of the rioters.

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Also like Grace, even after being forced out of the tunnel, and despite seeing and participating in violence inside the tunnel, Galetto chose to later re-enter. On his second stint in the tunnel, Galetto, like Grace, again joined the rioters and collectively pushed against the police line. Judge Kollar-Kotelly sentenced Galetto 27 months of incarceration following his guilty plea to violations of 18 U.S.C. § 111(a)(1) and 18 U.S.C. § 231(a)(3). Here, although Grace's and Galetto's actions are similar during the two initial entries into the tunnel, Grace entered the tunnel a third time, attacked police officers for a longer period of time, and directly made contact and pushed against officers even while being directed to leave.

In *United States v. Sargent*, 21-cr-258 (TFH), the defendant watched as police officers were being assaulted on the West Front and chose to move himself to the front of the crowd as the officers were retreating from the West Plaza to the West Terrace. Having maneuvered his way to the front of the skirmish line on the West Front, the defendant assaulted a USCP officer. Sargent pled guilty to violating 18 U.S.C. § 231(a)(3), 18 U.S.C. § 111(a)(1), and 18 U.S.C. § 1752(a)(1) and (2). Judge Hogan sentenced the defendant to 24 months' incarceration.

While no case is a perfect comparator, Grace's intent and actions on January 6 militate in favor of at least a midpoint sentence to reflect both the severity of his conduct and his acceptance of responsibility.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

restitution under the VWPA).[7] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Grace must pay $2,000 in restitution, which reflects in part the role Grace's played in the riot on January 6.[8] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* Grace's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 109.

## VIII.  CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp. 2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

sentence of 27 months of incarceration, 3 years of supervised release, $2,000 restitution, and a mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By: /s/ Ashley Akers
ASHLEY AKERS
MO Bar No. 69601
Trial Attorney, Detailee
601 D Street NW
Washington, DC 20001
(202) 353-0521
Ashley.Akers@usdoj.gov