UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | Docket No.: 0090 1:23CR00138-002 |
| v. | SENTENCING MEMORANDUM |
| Jonathan David Grace | Next Event; Sentencing January 30, 2024 |
| | Hon. Judge Reggie B. Walton |
| Defendant. | |

Defendant Jonathan Grace, by and through counsel, respectfully submits this memorandum in support of a non-Guideline sentence of probation.

## I.  HISTORY AND CHARACTERISTICS OF DEFENDANT

Jonathan David Grace was born August 10, 1974, in Pomona, California to David John Grace and Caroline (nee: Arnold) Reece. The defendant's father, age 83, resides in Knoxville, Tennessee, where he is a retired electrician. His mother, age 76, resides in Kingsburg, California, where she is a retired state worker. According to the defendant, his parents divorced when he was in the seventh or eighth grade and he spent most of his childhood living with his mother. He did not really know his father growing up, but when he attended graduate school, he lived with him and formed a good relationship. He stated his father is a kind man, and very religious. The defendant reported his father's cognitions are declining, and his father's wife helps to care for him. PSR ¶70

The defendant reported he is close with his mother and next to his wife, he speaks with her the most, and corresponds with her often through email. He did indicate his mother is also

1

very religious which caused strain for him as a child as well as the divorce of his parents caused issues. PSR ¶71

When asked to describe his childhood, Mr. Grace reported he was the valedictorian of his class in the eighth grade, however, there was heartache in the family caused by the divorce of his parents. He described himself as a "troubled teen" and reported his mother had a few different men in her life, causing him to be in and out of the home. He stated he became involved in weightlifting at school, and credits this for keeping him "on the straight and narrow." While he denied any abuse or neglect in the home, he stated he did not have a real father figure and the angst of the broken home, combined with a deep religious stringency, made his childhood difficult. PSR ¶74

On March 13, 1999, after dating for six months, Mr. Grace married Vanessa Elaine Gibbs in Ashland, Kentucky. The couple met while attending courses at a community college in Tennessee. Mrs. Grace works as an occupational therapist, and two work as a team together at the Center at Cordera, a skilled nursing facility, completing intake assessments. They have worked together for over fourteen years, and Mrs. Grace will always tell people it has been amazing to be able to work with her husband. She indicated since the defendant's indictment, she has picked up extra work in order to help with their expenses during this time.

Mr. Grace stated as in any marriage, there are ups and downs with their relationship, but overall, they have a strong marriage and are very much in love. Mr. Grace constantly expresses his honor in being able to share deep feelings and thoughts with her, and holds that she has been there for him through all of this. According to Mrs. Grace, her husband is kind, compassionate, and is her rock. The couple have no children. They enjoy being outside together biking, hiking, walking, and snowboarding, as well as indoor activities including ping pong, air hockey, and

playing guitar. Both the defendant and his wife ask that if he is ordered to serve a custodial sentence, they would like for him to be placed as close to Colorado as possible to facilitate visitation. PSR ¶75

In 2009, the defendant and his wife moved to Colorado and built their present home at 7867 Silver Birch Drive in Colorado Springs. Prior to moving to Colorado, the defendant lived in Johnson City, Tennessee for approximately seven years. He has also lived in Jonesborough and Knoxville, Tennessee, and Paso Robles, Atascadero, and San Miguel, California. PSR ¶76

Mr. Grace has never undergone any type of psychological evaluation, been hospitalized for psychiatric treatment, or been adjudicated mentally incompetent. PSR ¶79 Mr. Grace, he has never used any illicit drugs, and rarely consumes alcohol. He has never been through any type of substance abuse treatment. PSR ¶81

Mr. Grace graduated on December 18, 1999, from the University of Tennessee with a Bachelor of Science in Education, graduating Cum Laude. He went on to graduate school at East Tennessee State University in Johnson City, Tennessee, where he obtained his Master of Physical Therapy degree on May 3, 2003. He is now a licensed physical therapist in the state of Colorado and has his CPR certification (verified). Mr. Grace is uncertain if he will be able to maintain his PT licensure due to his conviction in the instant offense, and stated he should know more after he is sentenced. PSR ¶82

Mr. Grace never served in the U.S. military. He took the placement test for the Marine Corps but decided to go to college instead. A check with the Selective Service System verified the defendant registered for the draft as required on October 14, 1992. PSR ¶83

Since 2010 Mr. Grace has worked as a physical therapist for the parent company, The Center, since 2010. Since March 10, 2019, he has been employed at The Center at Cordera

in Colorado Springs. He has also worked The Center at Park West in Pueblo, The Center at Park View and at Centennial both in Colorado Springs. He has worked in his field, for almost 25 years, since graduating with his master's degree. PSR ¶84

From 2012 through 2017, Mr. Grace took a sabbatical from work to ease burnout from his profession. As a couple, they have both taken time off of work while one spouse supported the household. They saved money prior to each taking their own sabbatical and used the time to "find their way." Currently, as previously noted, Mr. and Mrs. Grace work on the same schedule together completing intake assessments. PSR ¶85

Mr. Grace is a caring and generous person who cares deeply, not only for, his close friends and family but also for each and every one of his patients, and also the people in his community, generally. Mr. Grace has been extremely successful in his profession, mainly due to the fact that his intrinsic nature is to help people. He has never sought to harm anyone or inflict any pain of any kind onto others, even those who may have hurt or wronged him in his life.  Throughout his life, he has never been motivated by evil or by malice. He is a man who has always tried to do the right things and conduct himself as god-fearing individual who abides by the laws of this nation, with respect and kindness for law enforcement and his fellow citizens.

Mr. Grace believes in United States Constitution and cherishes the democracy afforded to him under the constitution. Mr. Grace is a peaceful, caring man who has never committed any violence in his life, nor has he encouraged violence by others. He does not belong to any terrorist, fringe or violent groups, or any groups whatsoever. Mr. Grace did vote for Donald Trump twice, but he is not a Trump fanatic, or a political fanatic. He has never had any social media accounts and does not follow any cable news or right-wing media.  He is simply a small town man who tries to maintain his duties and obligations as a citizen and he reads the local

newspapers and follows the local news – which unfortunately is no longer free of financial and political influence.

Mr. Grace had no intention, ever, of engaging in the actions which led to his arrest. He came to Washington, DC, from Colorado, on January 6th with only his wife because he was led to believe – from his local media and large swaths of the community around him at home-that his vote for Mr. Trump in 2020 had been stolen; that the election had been stolen; that his country and this democracy was being stolen by and illegitimate President. Mr. Grace came to Washington, DC not to engage in any activity himself, especially not any type of violent or insidious activity.  He came to DC, for what he thought, would be a presentation of the evidence that President Trump promised would be on display and to take part in, what he thought would be,  peaceful protest at Ellipse.

It was only after the crowd or, by that time ,the mob had been charged and activated by extremely powerful and prominent individuals, including the former President, did Mr. Grace find himself in the grips of the mob, and what he can only describe as a blind fever, marching towards and onto the Capitol grounds.  However, as the government and the PSR has indicated, "Jonathan Grace (002) participated in the collective push inside the tunnel. It does not appear the defendant exercised managerial authority over any other participant and is considered to be an average participant whose conduct was not peripheral to the advancement of the Offense." PSR ¶42.

Immediately upon leaving the Capitol, the fever subsided in Mr. Grace and he immediately felt shocked and embarrassed at the behavior he had just engaged in (which again, did not exercise any "managerial authority over any other participant and is considered to be an average participant whose conduct was not peripheral to the advancement of the

Offense'). Mr. Grace was shocked and embarrassed because this behavior, which he is still struggling to come to terms with, did not reflect his fundamental morals and characteristics in any manner or shape whatsoever.

Mr. Grace, nonetheless, has never rejected the fact that regardless of the influence behind his behavior, he still had agency to choose to take these actions; engage in such behavior. He has fully accepted responsibility for his actions and understands that there must be punishment. However, what he still struggles with, and is embarrassed by, is the fact that he was foolish enough to believe the lies and misinformation that brought him to DC on January 6th and consequently led him to the Capitol.

Mr. Grace is not alone in that feeling as he is one of several million people across the world who have fallen prey and victim to the lies and misinformation that led to January 6th. Lies and misinformation have been used throughout history by many prominent and powerful individuals to manipulate others to achieve certain goals. In the United States, it seems that a new era with these tactics at its core, took flight in 2016, with really no end in sight and a second wave seemingly on the horizon. Americans ranging from the highest levels of success, power, wealth, education, and intelligence have fallen for these lies and misinformation and continue to do so at and alarming rate. Mr. Grace is not unique in believing such things, however it is his actions that should be judged and not his beliefs, as our constitution holds.

## II.    OFFENSE CONDUCT

Mr. Grace was arrested by law enforcement officials On March 30, 2023, in the District of Colorado where he made a first appearance before U.S. Magistrate Judge S. Kato Crews in Denver, Colorado.

On March 17, 2023, a Criminal Complaint was filed against Jonathan David Grace, in the United States District Court, District of Columbia, Docket Number 1:23mj00059-ZMF. The Complaint charged the defendant in Count 1 with a violation of 18 U.S.C. § 231(a)(3), that is Civil Disorder; in Count 2 with a violation of 18 U.S.C. § 1752(a)(1), that is Entering and Remaining in a Restricted Building or Grounds; in Count 3 a violation of 18 U.S.C. §1752(a)(4), that is Engaging in Physical Violence in a Restricted Building or Grounds; in Count 4 a violation of 40 U.S.C. § 5104(e)(2)(E), that is Obstruct, or Impeded Passage, through or within, the Grounds or any of the Capitol Buildings; and in Count 5 a violation of 40 U.S.C. § 5104(e)(2)(F), that is Engaging in an Act of Physical Violence in the Grounds or any of the Capitol Buildings. All counts occurred on January 6, 2021. PSR ¶1

Jonathan Grace participated in the collective push inside the tunnel. It does not appear the defendant exercised managerial authority over any other participant and is considered to be an average participant whose conduct was not peripheral to the advancement of the offense. PSR ¶42

On March 30, 2023, Jonathan David Grace was arrested in the District of Colorado where he made a first appearance before U.S. Magistrate Judge S. Kato Crews in Denver, Colorado. The defendant made an initial appearance, was appointed counsel, and entered a waiver of Rule 5 and 5.1 hearings. He was ordered released on a personal recognizance bond with conditions of supervision. PSR ¶2

On October 18, 2023, the defendant appeared in U.S. District Court in the District of Columbia, before U.S. District Judge Reggie B. Walton and pled guilty to the following felony offense: **ASSAULTING, RESISTING, OR IMPEDING CERTAIN OFFICERS** in violation of 18 U.S.C. § 111(a)(1) a Class D Felony (Count 2 of a seven-count Indictment) Pursuant to a

7

written plea agreement and Rule 11(c)(1)(A), the government agrees to move for the dismissal of the remaining counts after sentencing. The defendant acknowledges his understanding that a violation of 18 U.S.C. § 111(a)(1) carries a maximum penalty of eight years imprisonment, a fine of $250,000, a term of supervised release not less than three years, and an obligation to pay any applicable interest or penalties on fines and restitution not timely made. The defendant agrees to pay a special assessment of $100. PSR ¶5-6

### III.   GUIDELINES CALCULATION

The Supreme Court has made it clear that a district court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which is the "starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 457 (2007).

In Defendant's Presentence Report, the Probation determined his total offense level of 21, a criminal history category of I, and the guideline imprisonment range of 37 to 46 months on Count 8 and two years on Counts 9-11 (finding that the term of imprisonment in Counts 9-11 may run concurrently to each other but consecutively to any other counts).

The parties agree to the following U.S. Sentencing Guidelines (U.S.S.G.) calculation. The base offense level is 14, pursuant to U.S.S.G. § 2A2.2(a), and a six-level increase applies pursuant to §3A1.2. The Government agrees a two-level reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1 would be appropriate. The Government will move for an additional one-level reduction pursuant to U.S.S.G. § 3E1.1(b), conditioned upon the defendant clearly demonstrating acceptance of responsibility for the offense. The resulting estimated total offense level is 17. PSR ¶9

The parties further agree the defendant's Criminal History Category is estimated to **I**. The

parties estimate the sentencing guidelines range to be 24 to 30 months. At a guidelines level 17, the estimated applicable fine range is $10,000 to $95,000. The defendant reserves the right to ask the Court not to impose any applicable fine. PSR ¶10

## IV. MR. GRACE'S SENTENCE

In light of the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005) and its progeny such as Rita v. United States, 551 U.S. 338 (2007), Gall v. United States, 552 U.S. 38 (2007), and Kimbrough v. United States, 552 U.S. 85 (2007), the basic framework for sentencing now settled. First, the Court must determine the now-advisory Sentencing Guidelines range. Gall v. United States, 552 U.S. at 46. Second, the Court must undertake its overarching statutory charge to impose a sentence that, considering "the nature and circumstances of the offense and the history and characteristics of the defendant," is "sufficient, but not greater than necessary":

>  (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> 
>  (B) to afford adequate deterrence to criminal conduct;
> 
>  (C) to protect the public from further crimes of the Defendant and
> 
>  (D) to provide the Defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. §§ 3553 (a), 3553 (a)(1),(2).

Third, the Court should also consider "the kinds of sentences available . . . any pertinent Sentencing Commission policy statement the need to avoid unwarranted sentence disparities among similarly situated defendants . . . and, where applicable, the need to provide

9

restitution to any victims of the offense." United States v. Cavera, 550 F.3d 180, 188-89 (2d Cir. 2008), cert. denied, 556 U.S. 1268 (2009)(citations omitted); 18 U.S.C § 3553(a)(6). United States v. Davila-Gonzalez, 595 F.3d 42, 46 (1st Cir. 2010)("[A] sentencing court ordinarily should begin by calculating the applicable guideline sentencing range; then determine whether or not any departures are in order; then mull the factors delineated in 18 U.S.C. § 3553(a) as well as any other relevant considerations; and, finally, determine what sentence, whether within, above, or below the guideline sentencing range, appears appropriate.")

As the Guidelines "are not the only consideration," the district court must "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented." Gall v. United States, 552 U.S. at 49-50 (footnote and internal citations omitted)(emphasis added).

The Guidelines should not be given more or less weight than any other factor. See United States v. Carty, 520 F.3d 984, 991 (9th Cir.), cert. denied, 553 U.S. 1061 (2008). See also Nelson v. United States, 555 U.S. 350, 352 (2009)(per curiam) ("The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable.") (emphasis in original). A court "must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." Cavera, 550 F.3d at 189. As a result, a sentencing court is "generally free to impose sentences outside the recommended range." United States v. Sanchez, 517 F.3d 651, 660 (2d Cir. 2008)(a district court has broad latitude to "impose either a Guidelines sentence or a non-Guidelines sentence."); United States v. Daidone, 124 Fed. Appx. 677, 678 (2d Cir. 2005)(as the Guidelines are no longer mandatory, a departure is no longer necessary in order for the sentencing court to impose a sentence below the Guidelines

range). The Court's overall goal should be to impose a reasonable sentence, see, e.g., United States v. Guzman, 287 Fed. Appx. 956, 957 (2d Cir. 2008), and when considering the sentencing factors outlined in § 3553(a), "the judge is not prohibited from including in that consideration the judge's own sense of what is a fair and just sentence under all the circumstances." United States v. Jones, 460 F.3d 191, 195 (2d Cir. 2006).

To be sure, the Guidelines range as determined by the Court, although not mandatory is an important factor for the Court to consider. However, "[i]t is important, too, to realize that departures are an important part of the sentencing process because they offer the opportunity to ameliorate, at least in some respect, the rigidity of the Guidelines themselves. District judges, therefore, need not shrink from utilizing departures when the opportunity presents itself and when circumstances require such action to bring about a fair and reasonable sentence." United States v. Gaskill, 991 F.2d 82, 86 (3rd Cir. 1993). "The Guidelines are not a straightjacket for district judges." United States v. Cook, 938 F.2d 149, 152 (9th Cir. 1991). The Sentencing Guidelines "do not require a judge to leave compassion and common sense at the door to the courtroom." United States v. Milikowsky, 65 F.3d 4, 9 (2d Cir. 1995). Finally, the United States Supreme Court has noted "[i]t has been uniform and constant the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Koon v. United States, 518 U.S. 81, 113 (1996).

As such, the Court may impose a sentence outside the guidelines range if it "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C § 3553(b)(1).

11

### a. Acceptance of Responsibility for the Crimes

Mr. Grace has fully accepted responsibility for his crimes, and he shows sincere remorse. He did not resist his arrest or any part of the criminal process  He fully admitted that what he did was wrong, and he is fully accountable for his charged conduct.  An examination of the PSR shows that he realized that his actions were wrong, and his remorse is significant and authentic.  Mr. Grace has made it clear that he wants to do anything he can  to redress his wrongdoing.  Mr. Grace has voiced his desire to actively engage in groups and roles as soon as he can to educate others about his experience in order to prevent another January 6th , and from others making the same foolish mistakes he has made; prevent others from believing the lies and misinformation of others for nefarious purposes.

### b. Need for Deterrence.

The need for deterrence and the need to protect the public from future crimes, 18 U.S.C. § 3553(a)(2)(B)(c), applies strongly in this particular case.

General or indirect deterrence focuses on the general prevention of crime by making examples of specific deviants. The individual actor is not the focus of the attempt at behavioral change, but rather receives punishment in public view in order to deter other individuals from deviance in the future. As one court explained, "when discussing general deterrence, the Sentencing Guidelines expressly refer to the need for 'a clear message [to] be sent to society.' U.S.S.G. ch. 4, pt. A, introductory cmt. United States v. Crespo-Ríos, No. 13-2216, 2015 U.S. App. LEXIS 8555, *14 (1st Cir. 2015). While incarceration increases the deterrent effect of a sentence on others, "interest in general deterrence could [not] only be served by incarceration." United States v. Prosperi, 686 F.3d 32, 48 (1st Cir. 2012).   Specifically, the

Sentencing Commission noted that the Sentencing Guidelines were written, in part, to "ensure <u>a short but definite period of confinement</u> for a larger proportion of these '<u>white collar</u>' cases, both to ensure proportionate punishment and to achieve deterrence." <u>See</u> United States Sentencing Commission, Fifteen Years of Guidelines Sentencing, 56 (November 2004).

Specific deterrence focuses on the individual in question. The aim of these punishments is to discourage the criminal from future criminal acts by instilling an understanding of the consequences.

First, the fact that Mr. Grace, as one who has never before committed any crime, never before been disciplined in any way for engaging in any type of wrong doing, or never before even been issued a speeding ticket, now will have a felony conviction on his record, for life, which will affect his life in extremely significant manners (the ability to get a job, a loan, travel freely, etc.) serves as a powerful deterrence for the Defendant and sends a clear message to society that such behavior will not be tolerated by law enforcement and courts..

Second, Mr. Grace is a first-time offender, and it is extremely unlikely that he will ever commit any crime. As a first-time nonviolent offender, with a significant role in his family, a long history of education and employability, no criminal history, and full acceptance of responsibility, there is nothing to suggest that Mr. Grace poses any threat or risk of committing another criminal offense. <u>See, e.g.</u>, <u>United States v. Roth</u>, No. 05 CR 792-5, 2008 U.S. Dist. LEXIS 19603, at *7 (N.D. Ill. Mar. 11, 2008 (departing downward to sentence of probation where defendant posed no risk of recidivism based on lack of criminal history); <u>United States v. Paul</u>, 239 Fed. App' x. 353, 354 (9th Cir. 2007) (vacating defendant's 16 months' imprisonment for theft from a local government receiving federal funds, in part because the defendant was a first-time offender with absolutely no criminal record whatsoever.); <u>United States v. Ressam</u>,

13

679 F.2d 1069, 1098 (9th Cir. 2012) (Reinhardt, J., concurring) ("Similarly, a significant factor in determining the appropriate length of a sentence for those committing criminal offenses is ordinarily their past criminal history. What is a reasonable sentence for a first-time offender will often be unreasonable for a defendant with a lengthy criminal record, and vise-versa); United States v. Baker, 445 F.3d 987, 990-92 (7th Cir. 2006) (upholding downward variance based on the fact that "a prison term would mean more to [a defendant who has never been incarcerated before] than to a defendant who previously has been imprisoned.") The character letters submitted on behalf of Mr. Grace conclusively demonstrate the aberrant nature of his conduct that landed him before this Court; they discuss not only his genuine remorse but also the unlikelihood to commit future crimes.

Third, the apology letters written by Mr. Grace to the court, to law enforcement and to the people of the country demonstrates Mr. Grace's deep remorse and also his desire to never engage in any offensive conduct again, let alone criminal conduct – which is the way he has led his life in its entirety with the exception of January 6th.

Overall, given the circumstances of this matter, the goals of general and specific deterrence have already been accomplished in this matter without unnecessary significant additional incarceration.

### c. Personal Characteristics of Defendant

Mr. Grace has very strong family ties. His family, relatives, and friends have been fully supporting him immediately after his arrest. He is a proud husband of a wife who desperately needs his financial and emotional support and guidance. See, e.g., United States v. Chambers, 885 F. Supp 12, 15 (D.D.C 1995)("family circumstances do not decrease the

Defendant's culpability for her crime, they nevertheless play a role in the Court's consideration on sentencing. Causing the needless suffering of young, innocent children does not promote the ends of justice.").

The attached letters from Mr. Grace's family members, friends, and employers indicate their unconditional support during this ordeal. In those letters, Mr. Grace is characterized as a good husband, a good employee and a good man in general who does not reflect the actions which brought him in front of this court in any manner shape or form.  The letters make it increasingly clear that Jonathan Grace is a good, peaceful, god-fearing, law-abiding citizen who would never hurt others or take part in offensive or criminal conduct.

Mr. Grace and his wife Vanessa have no children, not because they didn't want to have children, but because they couldn't.  They overcame this sadness by ensuring that their love for each other and devotion to each other would be so rich that the void of children could not be felt. Vanessa is all Jonathan has and Jonathan is all Vanessa has.  They are vital to each other. Vanessa depends on Jonathan physically, emotionally, and financially and vice versa.  It is critical to note that the presence of Mr. Grace is crucial for  Mrs. Grace's mental and emotional well-being. As such, Mr. Grace's return to his wife is crucial for Mrs. Graces's mental, emotional, and financial well-being.

You Honor, please take into account that you are sentencing a proud, loving and caring husband and best friend, a reliable son and sibling, a hard-working individual whose job in life is to heal those in pain, whose criminal activities were just an unfortunate aberration from his otherwise law-abiding life. Finally, the following mitigating sentencing factors are relevant to the Court's consideration.

**Adjustment for Certain Zero-Point Offenders**

New Amendment 821 relating to criminal history in Part B of the proposed amendment sets forth a new Chapter Four guideline at §4C1.1 (Adjustment for Certain Zero-Point Offenders). The U.S.S.G. §4C1.1 would provide a decrease of 2 levels from the offense level determined under Chapters Two and Three if the defendant meets all of the following criteria: (1) the defendant did not receive any criminal history points from Chapter Four, Part A; (2) the defendant did not receive an adjustment under §3A1.4 (Terrorism); (3) the defendant did not use violence or credible threats of violence in connection with the offense; (4) the offense did not result in death or serious bodily injury; (5) the instant offense of conviction is not a sex offense; (6) the defendant did not personally cause substantial financial hardship; (7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense; (8) the instant offense of conviction is not covered by §2H1.1 (Offenses Involving Individual Rights); (9) the defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense); and (10) the defendant did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848) See https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230405_prelim-RF.pdf

Mr. Grace is a first-time offender and meets all the applicable criteria under the Amendment. Moreover, the Court to "increase fairness in sentencing" should consider applying this two-point reduction to his sentence.

As the Supreme Court reiterated, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an

16

individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Pepper v. United States, 131 S. Ct. 1229, 1239-40 (2011)(quoting Koon v. United States, 518 U.S. 81, 113, 116 S. Ct. 2035, 135 L. Ed. 2d 392 (1996).

The nature of the offense, Mr. Grace's personal characteristics, his immediate responsibility for actions and offenses, clear remorse, lack of any criminal history whatsoever, and family circumstances strongly favor the imposition of a non-guidelines sentence. Please keep in mind that Mr. Grace's sentence would affect not only his life but also the lives of his vulnerable wife, and elder parents, who desperately need his assistance, guidance, and love.

Mr. Grace's life has been rocked by his actions and their consequences.  He has been arrested, charged and convicted for actions and behavior that he, himself, was shocked and embarrassed by – actions and behavior which he still has difficulty comprehending as to how he allowed himself to engage in. Mr. Grace has realized and admitted his mistakes from the moment he left the Capitol on January 6, 2020.  He has learned his lessons (and continues to learn and educate himself), and the sentence of only probation would help him to rebuild his life and reunite him with his wife.

Mr. Grace asks this court for mercy and to allow him to begin to find a way to become a resource in society that will to work to prevent others from committing the same mistake by informing and educating others about misinformation, and how to sperate truth from lies and deception used by powerful individuals, targeted towards common people, to do their bidding. Mr. Grace also wants to work with others to ensure that his fellow citizens understand the American democracy and how to properly voice disagreements, fear, anger, anxiety.  Mr. Grace

would like to actively be involved in roles where he can help ensure that another January 6th never happens again.

## **CONCLUSION**

For all these reasons, Mr. Grace respectfully requests that the Court impose a non-guideline sentence of probation. This sentence would be sufficient but not greater than necessary to achieve the goals and dictates of 18 U.S.C. § 3553.

In support of this sentencing memorandum and the sentence sought within it, seven exhibits (labeled Exhibit 1-7) have been attached/filed with this memorandum. These exhibits are character letters written on behalf of Mr. Grace by family, friends and even employers. The exhibits also include apology letters written to the court by Mr. Grace himself.

Respectfully submitted,

/s/ Nabeel Kibria, Esq.

_____

Nabeel Kibria
800 Connecticut Avenue, NW
Suite 323
Telephone: 202.698.4439
Email: nabeel@ervinkibrialaw.com

Attorney for Defendant Jonathan Grace

Dated: January 26, 2024

cc:

Clerk of the Court  (by ECF)
All counsel of record (by ECF)